**IN THE COURT OF APPEALS OF IOWA**

No. 22-1999
Filed December 20, 2023

**NINA LAGODMOS,**
  Plaintiff-Appellant,

**vs.**

**HEIDELBURG MOTEL and LOISE PANG,**
  Defendants-Appellees.
_____

  Appeal from the Iowa District Court for Henry County, Joshua P. Schier, Judge.

  The plaintiff appeals the district court's ruling in favor of the defendants on her innkeeper-negligence claim. **AFFIRMED.**

  Andrew B. Howie of Shindler, Anderson, Goplerud, & Weese, P.C., West Des Moines, for appellant.

  Tyler R. Smith and Michael J. Carroll of Gordon Rees Scully Mansukhani, Des Moines, for appellees.

  Heard by Greer, P.J., and Ahlers and Buller, JJ.

**GREER, Presiding Judge.**

Nina Lagodmos brought suit against the Heidelburg Motel and its owner, Loise Pang,[1] (collectively, the Defendants) alleging they were negligent because they failed to keep her safe from verbal abuse and physical assault by other guests, from which she suffered harm. After a trial to the bench, the district court ruled in favor of the Defendants.

Nina appeals the district court ruling, arguing that while the district court applied the correct law, it came to the wrong conclusion when it determined the Defendants took reasonable steps to prevent harm to her by other motel guests and, therefore, did not breach their duty to her.

**I. Background Facts and Proceedings.**

Nina lived at the Heidelburg Motel for several years—ending in 2017—with the man she refers to as her husband, David Howard. Nina acted as the caregiver for her adult brother, Michael Lagodmos, who experiences unspecified disabilities due to some form of mental illness. Except for the periods when he was hospitalized or living at a local mental-health institution, Michael lived with Nina and David.

After they moved out, Nina brought a negligence suit against Loise and the Heidelburg Motel, claiming she was the victim of numerous threats, verbal abuse, and two physical assaults by other guests and their visitors. She maintained she suffered physical injury and chronic post-traumatic stress disorder (PTSD) as a

---

[1] At various points in the record, the spelling and name of the business and the spelling of Pang's first name are expressed differently; we use the names as provided in the caption.

result, which she believed Loise and the motel were liable for because she and David both reported the ongoing issues to Loise and he had a duty, as the operator of the motel, to prevent foreseeable harm to her.

The case was tried to the bench in 2022.

David testified that, before 2016, the Heidelburg Motel was calm. People would spend time outside barbequing or hanging out, but it was quiet. Then at some point in 2016, Nina was looking out the window of their unit and saw a man with a hammer coming up behind another man. Nina went to the door and shouted, "Stop!" The man with the hammer turned toward Nina and told her, "I'm getting you now, bitch" and then came at Nina with the hammer. Nina closed the door and then Nina or David called 911; David also told Loise about the incident. According to David, after that, things generally went back to the usual quiet until April 2017. But in Nina's view, things took a turn for the worse, and from April until July, David or Nina called the police more than twenty-five times. David testified that each time they called, they also let Loise know about their complaint. For the first call, on April 17, two neighbors were arguing; when Nina opened the door of her unit and asked them to be quiet, the pair "turned on Nina" and "[i]n a threatening manner" told her "I'm going to beat you" while walking towards her. David described a similar incident on May 7, when a neighbor and his girlfriend were arguing; Nina told them to be quiet and was then verbally threatened by the man while he came toward her with his fist clenched. Most of the calls stemmed from complaints about other guests being noisy—sometimes yelling or verbally fighting, but often laughing, listening to music, or (according to the police reports admitted at trial) even just talking outside. Michael testified that, generally, there was "a lot

of activity" outside of their unit and people were "hitting each other, verbally abusing each other, slamming doors, stuff like that." He also testified that people listened to loud music and used foul language and, more than one time, people called Nina a whore and threatened to kill her.

Nina testified about the "hammer incident," identifying the man who threatened her as Cody, and another instance when a guest named Mario threatened her. She said she told Loise about the various issues and asked him to evict some of the individuals. She also testified she asked if she, David, and Michael could move into another room but Loise declined, saying it would be too expensive for him. By July 9, Nina and David had been considering moving for a while. From July 8–11, David left to stay somewhere else, while Nina and Michael remained at the motel. On the afternoon of July 9, Nina went outside to take some pictures of a vehicle. According to Nina:

> I only had a few minutes to do that, because I didn't know how long they'd be away—inside, and it seemed almost immediately when I was outside that it just, to my side, my right, yelling and screaming started, and I believe I turned slightly and saw them, Irma, Casey, and they were punching each other, and I—I froze. I got—I went, I gotta get inside, and—I don't know how fast I moved. I don't think I moved very fast, but I walked backwards, trying to make myself very small, just thinking get inside, Nina, get inside, and I—I remember being up in the doorway thinking I'm there, I'm in, and I heard—well, I heard her voice getting closer to me. It was Irma's voice. And I remember severe pain in my head, and it seemed like I went sailing backwards, or flying or whatever, but that's how it felt, and—yeah.

The next day, Nina went to the emergency department. Nina testified she was shaking, crying, and unable to tell the medical personnel what happened to her because she was so upset. She asked them to call the police so she could make a report about what happened. The medical report from Nina's visit stated, in part,

"No headache, dizziness, weakness, chest pain or palpitations." It also noted Nina's claim that "for 3 months [she] has been experiencing increased anxiety due to 'violent' neighbors and sustains verbal threats." The police report states: "Patient wanting to report a verbal disturbance with her [neighbor] Nina is claiming (verbal) abuse to the physician."

According to Michael, he was in the room when Nina was "punched in the head, so she flew backwards" and hit her head on the floor. Nina was bleeding and, later, began vomiting. When asked more questions about this incident at trial, Michael testified that he could not remember whether he actually saw Nina being hit and stated he tends to block out painful things. He later explained he has memory issues and admitted that David wrote down statements for him. When asked if he would repeat things told to him by someone he trusts, Michael was unable to respond whether he would. Although David was not present for the assault Nina alleges occurred on July 9, he described injuries he saw on Nina when he returned on July 11, testifying he saw "broken blood vessels" along the edge of her ear along with swelling and a bruise on her head. According to David, Nina had memory problems and stayed in bed a lot after the July 9 assault.

On July 13, Nina completed a physical therapy medical questionnaire, on which she handwrote:

> After/on Mon. July 10th 2017 was assaulted ringing in right ear, swollen bruised right side face, body pain/sore/neck cracks when bent forward, right side back, rib & hip part/hit back of head when I went [flying] down/backward, right back shoulder blade/rib area etc. tailbone/hip right, back head pain/acute. Yes still sore & [illegible] ringing in ear still happening, feel panicked & afraid, etc.

David also detailed a July 23 incident, when a group of twelve or so people were outside and some began arguing and shoving each other. David called 911 while Nina used her phone to record the incident with her hand outside the window. Nina dropped her phone, and someone else moved to pick it up. Nina exited the unit to get her phone back, and then a second woman knocked the phone out of Nina's hand. At about that time, police officers arrived and broke up the gathering. The woman who struck the phone out of Nina's hand was later charged with assault.

Nicole Mitchell lived at the Heidelburg Motel during the same time as Nina; she testified by way of deposition that she heard other guests call Nina "a crazy bitch; psycho bitch. . . . Even called her a fucking whore once." Nicole described people having barbeques outside of Nina's room and being loud; when Nina told them to be quiet, one of the guests "just yelled back at her and they had a small yelling match. Nina went back in. Police called." She remembered the same group of people having a barbeque near Nina's room "more than seven" times; the cops would generally always be called, but the group would get quiet before an officer arrived. She also remembered that Loise would come down sometimes and "try to reason with" the group. "They'd act like, you know, like they were agreeing with everything he said."

A few police officers who responded to calls from Nina and David also testified. They noted that "10-96" was included in some of the reports of Nina and David's complaints and explained that is used when the officer believes the person is not mentally competent or "what the person saw may not be exactly what the officer is seeing or is hearing." One former officer—now retired—testified that it was frequently the case when David or Nina called that an officer would respond

and find no criminal activity by any guests. The same officer testified that Nina and David were upset all of the time but it was about things the officers were unable to confirm were actually happening.

A number of medical records from various providers who worked with Nina, attempting to diagnose and treat her, were introduced at the trial. And, at the time of trial, Nina had a diagnosis of chronic PTSD. Dr. Darbie Little-Cooper, a psychiatrist Nina had been seeing since July 2021 for psychotherapy, also testified at trial; she explained Nina's need for ongoing therapy and medication and expected that need to continue—possibly for Nina's lifetime. Dr. Little-Cooper opined the "inciting event" for Nina's chronic PTSD were incidents at the Heidelburg Motel; she recognized she was not present and could not say with certainty, but she noted "that is what Nina references whenever we're speaking about her symptoms and trauma."

Loise testified in his own defense. He detailed what he did after Nina and David would complain to him about noise, including talking with other guests and asking them to turn down their music or refrain from having loud conversations outside. He explained that other guests also came to him with complaints about Nina and David, who also had loud fights and sometimes shouted at other guests. At least once, Nina told Loise she felt threatened by other guests; Loise talked to the other guests, who denied making the threats. Loise was unsure who to believe, but he offered to bring David, Nina, and the other guests together to try to mediate their differences. Nina and David refused. Loise never personally saw or heard anyone threaten Nina, and he never witnessed a physical assault of Nina. But he relocated Cody to another part of the motel after Nina complained about him. Loise

also testified that he was never informed Nina went to the hospital on July 10—he only learned of the fact after the lawsuit was initiated.

At trial, the parties stipulated that Nina had past medical bills for $15,480.70. In her written argument filed after trial, Nina asked the district court to award her $967,140 in damages for "past and present pain and suffering, loss of full body and mind function, and loss of enjoyment of life."

In a written ruling, the district court ruled in favor of the Defendants. In addition to the detailed factual findings, the court concluded that Nina, Michael, and David all lacked credibility. The court decided it could not conclude the July 9 assault ever took place, which it decided meant that the July 23 assault (when Nina's cell phone was knocked out of her hand) was not foreseeable to Loise. The court found the continued verbal conflicts between Nina and other guests were foreseeable, but it concluded Loise was not liable for any harm Nina suffered as a result of them because he took reasonable steps to protect Nina from such harm.

Nina appeals, contending "the district court's findings and conclusions of law are not supported by substantial evidence" and urging us to find the court erred in finding Loise took reasonable steps to avoid the harm to Nina.

## II. Standard of Review.

We review a judgment entered after a bench trial for correction of errors at law. *Metro. Prop. & Cas. Ins. Co. v. Auto-Owners Mut. Ins. Co.*, 924 N.W.2d 833, 839 (Iowa 2019). "The district court's factual findings have the effect of a special verdict and are binding on us if supported by substantial evidence." *Id.* "Under this standard, we view the evidence in a light most favorable to upholding the district court's judgment." *Benson v. Webster*, 593 N.W.2d 126, 129 (Iowa 1999).

**III. Discussion.**

Nina brought suit against Loise and the motel for negligence, meaning that, as the plaintiff, she had the burden to establish a prima facie case, which includes the following elements: (1) the defendants owed her a duty of care, (2) the defendants breached that duty, (3) the defendants' breach was both a factual cause of harm suffered and the harm was within the scope of the defendants' liability, and (4) she suffered damages. *See Kindig v. Newman*, 966 N.W.2d 310, 323–24 (Iowa Ct. App. 2021) (laying out the elements of negligence); *see also Thompson v. Kaczinzski*, 774 N.W.2d 829, 837–38 (Iowa 2009) ("Accordingly, to eliminate the resulting confusion of factual and policy determinations resulting from the Restatement (Second) formulation of legal cause, the drafters have opted to address factual cause and scope of liability (proximate cause) separately.").

Here, it was undisputed that Loise, as the innkeeper,[2] owed Nina a duty of reasonable care. *See* Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 40 (Am. Law. Inst. Aug. 2023 update) [hereinafter Restatement (Third)] (providing that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship" and including an innkeeper and its guests as one such special relationship); *see also Benninghoven v. Hawkeye Hotels, Inc.*, No. 16-1374, 2017 WL 2684351, at *4 (Iowa Ct. App. June 21, 2017) (recognizing a hotel's duty to its

---

[2] The parties seem to agree Loise is an innkeeper—not a landlord. *See Tenney v. Atl. Assocs.*, 594 N.W.2d 11, 15–18 (Iowa 1999) (providing that landlords, like innkeepers, owe a duty of care to protect tenants from reasonably foreseeable harm); *accord id.* at 15 (recognizing the similarity of the innkeeper-guest relationship and the landlord-tenant relationship).

guests).  And that duty is not limited to keeping the premises in a reasonably safe condition; the innkeeper's duty extends to risks "created by a third party's conduct, whether innocent, negligent, or intentional."  Restatement (Third) § 40 cmt. g.

That said, "an innkeeper is not an insurer of the safety of its guests." 19 *Williston on Contracts* § 53:85 (4th ed. May 2023 update); *see also Tenney*, 594 N.W.2d at 15 (recognizing "[a] landlord is not an insurer against every conceivable act by a third party").  "[T]he duty imposed requires only *reasonable* care under the circumstances."  Restatement (Third) § 40 cmt. d.

Part of deciding what precautions or actions Loise needed to take to meet the standard of exercising reasonable care is considering what was foreseeable to him at the time.  *See Thompson*, 774 N.W.2d at 835 ("In order to determine whether appropriate care was exercised, the factfinder must assess the foreseeable risk at the time of the defendant's alleged negligence." (citation omitted)).  "The extent of foreseeable risk depends on the specific facts of the case and cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable."  *Id.* (citation omitted); *accord* Restatement (Third) § 7 cmt. j.  So, "[c]ourts should leave such determinations to [fact finders] unless no reasonable person could differ on the matter."  *Thompson*, 774 N.W.2d at 835 (citation omitted); *accord* Restatement (Third) § 7 cmt. j.

Here, the district court was the fact finder, and because of a lack of credible evidence produced at trial, the district court could not find that Nina was assaulted at the motel on July 9.  And, based on the lack of prior physical violence, the court determined that the July 23 assault—when another guest knocked Nina's cell

phone out of her hand—was not foreseeable to Loise. The court concluded that because the July 23 assault was not foreseeable, Loise's duty to Nina did not require him to take any specific steps to prevent it. *See Benninghoven*, 2017 WL 2684351, at *5 ("The innkeeper may be liable for assaults of third parties upon guests *where the innkeeper has reason to anticipate the assault* but fails to exercise reasonable care to prevent it." (emphasis added) (quoting Barry A. Lindahl*, 1 Modern Tort Law: Liability & Litigation* § 3:50 (2d ed. June 2016))). Put another way, neither Loise nor the motel breached their duty of reasonable care to Nina in failing to prevent the July 23 assault. Finally, the district court explicitly found that Nina, Michael, and David all lacked credibility. To this point, the court ruled its "efforts to get at the truth of the matter was further exacerbated by the contradictions between [Nina's] witnesses' testimony and [her] own exhibits." Thus, we turn to our role, which is to review the evidence in the light most favorable to upholding the district court's decision. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 388 (Iowa 2010).

But, as Nina emphasizes in her appellate brief, the district court did conclude that "*continued verbal conflicts*" between Nina and other guests were foreseeable. (Emphasis added.) Still, the question comes down to whether the Defendants breached their duty to Nina—which is a question left to the fact finder. *See Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 780 (Iowa 2013) (noting that to fulfill its duty a bar might merely be required to employ reasonable safety precautions, but the question of what reasonable care is required under these circumstances is a determination for the fact finder). Referencing Nina's claim that she was harassed, the district court found that of the approximately

twenty-five reports made to the police, twenty consisted of Nina or David making noise complaints—with no mention of threats or abuse toward Nina—and often the responding police officer ultimately advised Nina and David that the other guests were not acting illegally. There were times the officers told the other guests to be quieter or keep it down, but several reports expressly conclude that the complained-of guests were not being loud or acting inappropriately. Of those few reports mentioning "harassment" or "verbal abuse," the police investigated and found nothing to warrant further action. In the end, the district court noted: "Just because a party makes a complaint does not mean that complaint is valid or its allegations are factual. Along those same lines, just because a complaint is made does not mean a party is put on notice that another is in danger."

Nina contends that the district court was wrong to conclude that Loise exercised reasonable steps to avoid the harm to Nina. But after an extensive discussion of the facts and the credibility of the witnesses, the district court reviewed the steps Loise took to protect Nina from verbal threats and abuse by other motel guests, which included speaking to the individuals Nina complained of, offering to bring Nina and David together with the other guests to mediate their differences (which Nina and David refused), moving one of the guests Nina had a problem with—Cody—to another room further away, and—on July 23—coming out of the office to break up a large gathering and telling the offending person to leave the property. The district court concluded Loise took reasonable steps to avoid harm to Nina based on verbal conflicts with the other guests so he and the motel did not breach their duty to Nina. The court ended its analysis there, ruling in favor of the Defendants. In viewing these actions, we note "the law itself must take care

to avoid requiring excessive precautions of actors relating to harms that are immediately due to the improper conduct of third parties, even when that improper conduct can be regarded as somewhat foreseeable." Restatement (Third) § 19 cmt. g. And as for Nina's complaint that Loise did not evict the offenders she identified, with these facts and the clear credibility findings, we cannot say that Loise was required to discontinue renting rooms to any number of guests of whom Nina complained as part of his duty to act with reasonable care.

Because substantial evidence supports the district court's ruling, it did not err in ruling in favor of the Defendants.

**AFFIRMED.**